IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED: **1/6/23**
U.S. DISTRICT COURT
EASTERN DISTRICT COURT
DAVID A. O'TOOLE, CLERK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § Plaintiff, § § v. § § RELIABLE ONE RESOURCES, INC., § QUANTUM FILTRATION, INC., § CLYDE CAMERON CRAVEY, and § KENNETH WIEDRICH, § § Defendants. § § | Case No.: **6:23-cv-6 JCB/JDL** <br><br> JURY TRIAL DEMANDED <br><br> FILED UNDER SEAL |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") files this Complaint against Defendants Reliable One Resources, Inc. ("Reliable One"), Quantum Filtration, Inc. ("Quantum Filtration"), Clyde Cameron Cravey ("Cravey"), and Kenneth Wiedrich ("Wiedrich") (collectively, "Defendants"), and respectfully show the Court as follows:

### I.
### SUMMARY

1. Since February 2015, Cravey, Wiedrich, and two entities they control (Reliable One and Quantum Filtration) have raised approximately $34 million from over 500 investors through the fraudulent, unregistered offer and sale of Reliable One stock based on multiple material misrepresentations and omissions. Defendants continue to seek to raise money from investors.

2. From the time Reliable One was formed in 2015, Cravey, Wiedrich, and Reliable One have: (a) concealed (and continue to conceal) Cravey's active involvement in Reliable

One's management and operations to prevent investors from learning about his checkered past, including an $8 million Texas securities fraud judgment entered against him in 2012; and (b) repeatedly misrepresented to investors that an initial public offering ("IPO") of Reliable One's stock was forthcoming when the company has taken no steps towards pursuing an IPO.

3. Beginning in 2020, the Defendants sought to exploit the COVID-19 pandemic by promoting that: (a) Quantum Filtration (Reliable One's subsidiary) was, as a result of cutting-edge technology, producing and selling face-masks that blocked the COVID-19 virus and were N-95 certified; and (b) that the U.S. Food and Drug Administration ("FDA") would imminently be approving these masks so Quantum Filtration could offer them for sale. In fact, Defendants each knew (or were severally reckless in not knowing) that the Quantum mask did not have a NIOSH certification,[1] which was a prerequisite to obtaining an N-95 certification. They actually each knew by least February 2021 that Reliable One's sample masks containing the membrane that was to provide the promised protections had been submitted for testing necessary to seek NIOSH certification and that it had "failed miserably." Despite this knowledge, the Defendants continued to tell investors that they were selling N-95 certified masks through Quantum Filtration's website. Further, Reliable One disseminated investor update emails that represented that it expected to imminently obtain FDA approval to confirm the effectiveness of its masks to block and kill the COVID-19 virus. However, even though Reliable One stated that it was "currently awaiting our [510k] approval from the FDA," Wiedrich and, through him, Reliable One and Quantum Filtration, each knew (or were severely reckless in not knowing) that Reliable One had never even submitted a 510(k) application to the FDA.

---

[1] The National Institute for Occupational Safety and Health ("NIOSH") is a federal agency responsible for testing and approving respirators used in U.S. workplace settings. According to a NIOSH publication, NIOSH only approves respirators that pass its strict quality assurance and performance requirements.

4.  Additionally, Defendants misled investors about the existence of business deals and prospects, including: (a) in or around October 2020, representations that Reliable One had orders from Saudi Arabia for approximately 15 million masks and five million gallons of hand sanitizer; and (b) in or around August 2021, representations that Reliable One had an agreement with the parent company of the Six Flags amusement park chain to disinfect the parks' pool waters. In reality, Reliable One had no orders from Saudi Arabia and no agreement with Six Flags.

5.  Finally, Cravey, Wiedrich, and Reliable One misled investors about Reliable One's use of investor funds to pay salaries to officers and directors and to pay commissions to salespeople. In Reliable One's public filings and investor-solicitation materials, Cravey, Wiedrich, and/or Reliable One represented that Reliable One would not use investor funds to pay salaries to its officers and directors. However, Cravey and Wiedrich knew—because they controlled Reliable One's bank accounts—that Reliable One paid more than $2.1 million to officers and directors, including at least $545,000 to Cravey, whose active involvement in Reliable One was concealed from investors. Further, Cravey, Wiedrich, and Reliable One disseminated Private Placement Memoranda ("PPMs") to investors representing that Reliable One *may enter* into agreements with FINRA-registered broker-dealers to sell shares of Reliable One, but that Reliable One *had not entered* into any agreements with any broker-dealer as of the date of the PPM. In truth, not only was Reliable One paying sales commissions at that time, but the salespeople were not representatives of FINRA-member broker-dealers.

6.  Through their actions, Defendants have violated—and continue to violate—the antifraud provisions of the federal securities laws, namely Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") and Rule 10b-5 thereunder. In addition, Defendants have offered and sold—and continue to offer and sell—securities in an unregistered offering, in violation of the securities-registration provisions of the federal securities laws, specifically Sections 5(a) and 5(c) of the Securities Act. Unless Defendants are enjoined by the Court, they will continue to fraudulently offer and sell securities in violation of the federal securities laws.

7. To protect the public from further illicit activity and harm, the Commission brings this action against Defendants and seeks: (a) emergency temporary and preliminary relief; (b) permanent injunctive relief; (c) disgorgement of ill-gotten gains resulting from Defendants' violations of the federal securities laws, plus prejudgment interest on those ill-gotten gains; (d) civil penalties; (e) an order prohibiting Cravey and Wiedrich from each serving as an officer or director of a public company; and (f) an order barring Cravey and Wiedrich from participating in any offering of penny stocks.

## II.
## JURISDICTION AND VENUE

8. Defendants offered and sold stock of Reliable One, which is a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

9. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. § 78u(d)].

10. This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] because Defendants directly or indirectly made use of the means or

instrumentalities of commerce and/or the mails in connection with the transactions described herein.

11.     Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district. Further, Cravey resides in this District, and Reliable One and Quantum Filtration maintain their principal places of business in this District.

### III.
### DEFENDANTS

12.     **Reliable One** is a South Dakota corporation formed in 2015 with its principal place of business in Athens, Texas. Cravey and Wiedrich own a majority interest in Reliable One, and have jointly controlled Reliable One's operations since its inception. Neither Reliable One nor its securities are registered with the Commission in any capacity.

13.     **Quantum Filtration** is a South Dakota corporation formed in 2020 with its principal place of business in Athens, Texas. Quantum Filtration is a wholly owned subsidiary of Reliable One. Cravey and Wiedrich have jointly controlled Quantum Filtration since its inception in 2020. In June 2021, South Dakota administratively dissolved Quantum Filtration's corporate status for failure to file an annual report. Despite its dissolution, Quantum Filtration continues to operate. Neither Quantum Filtration nor its securities are registered with the Commission in any capacity.

14.     **Cravey**, age 54, resides in Eustace, Texas. Throughout the time period relevant to this Complaint, Cravey served—either formally or in a *de facto* manner—as the Chairman of the Board and CEO of Reliable One. Regardless of his title (or lack thereof), Cravey exercises control over Reliable One and its affiliates along with Wiedrich. In 2012, a Texas state district

court entered an $8 million judgment against Cravey for defrauding investors in a fraudulent securities offering in violation of the Texas Securities Act. On August 12, 2010, Cravey and his wife filed for Chapter 13 bankruptcy in the United States Bankruptcy Court, Northern District of Texas, Fort Worth Division.

15. **Wiedrich**, age 76, resides in Forney, Texas. He is Reliable One's President and CFO, and he owns a majority interest with Cravey. Before his involvement with Reliable One, Wiedrich served as CFO for at least four OTC-traded entities,[2] including three SEC-reporting companies. He has never been licensed as a Certified Public Accountant ("CPA").

## IV.
## FACTS

### A. Background

16. In February 2015, Cravey directed Wiedrich to form Reliable One. Reliable One's internal documents—including its organizational charts and management biographies—identify Cravey as Reliable One's CEO and the Chairman of its Board of Directors and Wiedrich as Reliable One's President and CFO. In addition, both Cravey and Wiedrich are signatories on the bank accounts for Reliable One and its affiliates. In short, regardless of their titles, Wiedrich and Cravey have jointly controlled Reliable One as partners, making all of the company's important decisions.

17. Reliable One claims to possess a "disruptive technology" that is capable of purifying contaminated water into potable water on an industrial scale. Since its inception, the company has continuously touted its plan to implement its industrial water-treatment process—purportedly by deploying mobile units and constructing large water purification plants—to

---

[2]  Over-the-counter ("OTC") securities are securities that are not listed on a major exchange in the United States; instead, they are offered and sold via broker-dealer network, typically because many are smaller companies and do not meet the requirements to be listed on a formal exchange.

purify water that has been contaminated during use in the oil-and-gas fracking process. To-date, the company has not successfully implemented its plan and has never earned any revenue from its water-purification business.

18. On February 29, 2020, Cravey and Wiedrich formed Quantum Filtration, as a wholly owned subsidiary of Reliable One, to market face masks, air filters, and water desalinization filters using technology purportedly derived from Reliable One's efforts to develop its water-purification business. The following month (March 2020), as the COVID-19 pandemic was enveloping the United States, Cravey and Wiedrich began focusing Reliable One's investor solicitation efforts on Quantum Filtration to tout a facemask, which Cravey, Wiedrich, and Reliable One claimed (and continue to claim) uses a nanofiber membrane capable of *blocking* the COVID-19 virus.

### B. Reliable One Has Engaged in an Unregistered Securities Offering Since 2015.

19. Since Reliable One's creation in February 2015, Reliable One has engaged in an ongoing offering of its common stock at prices ranging from $0.50 to $3.00 per share. Through this offering, Reliable One has raised at least $34 million from investors from February 15, 2015 through approximately May 2022. At various times since its creation, Reliable One's net assets were less than $5 million.

20. From the outset, Cravey, Wiedrich, and Reliable One have promoted the offer and sale of Reliable One's stock through various means, including public websites, press releases issued to the public, cold-calls and bulk e-mail blasts to individuals identified on purchased lead lists, in-person sales presentations, and word-of-mouth advertising from existing investors who introduced the investment opportunity to their friends.

21. As part of its solicitations, Reliable One provides interested investors with: (a) a Private Placement Memorandum ("PPM"),[3] approved by Cravey and Wiedrich, which provides information about the company; (b) periodic updates and other information; and (c) an investor suitability form for investors to fill out and return. Reliable One provides investors with the suitability form to purportedly help the company determine "accredited investor" status. Instead of taking additional steps to confirm the information provided by investors (or to otherwise independently determine if investors are accredited), the company simply relies on the answers provided by the investors.

22. Cravey and Wiedrich shared joint responsibility for reviewing and approving Reliable One's PPM, investor suitability forms, financial projections, website content, and other information provided to investors. Wiedrich took a leading role in drafting the PPM and the investor-update emails. Cravey often approved update emails sent by others on behalf of Reliable One, drafted investor emails, cold-called prospective investors, and instructed Reliable One sales representatives about what to tell prospective investors on phone calls. Both Cravey and Wiedrich spoke directly to investors, as necessary, to close stock sales.

23. To offer and sell Reliable One stock to investors, Reliable One enlisted its own employees and at least seven outside salespeople to cold-call individuals listed on purchased lead lists. For each investor who expressed an interest in purchasing Reliable One stock, Cravey and Wiedrich instructed a salesperson to send the investor a copy of Reliable One's PPM. At in-person sales presentations, a Reliable One employee delivered the PPM directly. As Wiedrich admitted in sworn testimony, Reliable One paid the responsible salesperson a commission ranging from 12% to 30% of the purchase price for each sale of Reliable One stock. In addition,

---

[3] There have been multiple versions of the PPM throughout the time period relevant to this Complaint. The primary difference between the versions relates to the discussion of recent business activities.

at least one salesperson earned his sales commissions by purchasing blocks of Reliable One stock at a 20% discount to the offering price, and then selling the stock to investors at a markup, pocketing the difference between the markup and his discounted purchase prices.

24. In March 2017, Reliable One filed a notice of purportedly exempt offering of securities on the Commission's Form D, which was signed by Wiedrich and which claimed that Reliable One's stock offering was exempt from registration under Regulation D, Rule 506(b). As discussed below, the Form D was (and continues to be) materially false.

**C. Defendants Made Fraudulent Statements and Omissions Throughout the Offering.**

**(i) Concealing Cravey's Control over Reliable One**

25. Reliable One's PPMs and its Form D failed (and continue to fail) to disclose Cravey's key role with Reliable One. The Form D identified Reliable One's officers and the PPMs contained a list of (and biographies for) Reliable One's executive officers and directors. However, Cravey's name was omitted from both of these key documents. Wiedrich testified under oath that Cravey instructed him to omit Cravey's name from the documents to prevent investors from discovering "negative" information about Cravey on the internet. The negative information includes easily accessible information that Cravey is subject to an $8 million Texas state securities-fraud judgment obtained in 2012 by investors in an earlier Cravey-led securities offering. The lawsuit alleged that Cravey and several members of his family committed multiple violations of the Texas Securities Act in a "nationwide oil and gas securities fraud scheme."

**(ii) Falsely Promising an Initial Public Offering**

26. At Cravey's instruction (and as Wiedrich knew), Reliable One salespeople regularly represented to investors that a Reliable One initial public offering ("IPO") was imminent. For example, in a March 2021 email to an investor (on which Cravey was copied), a

Reliable One employee said, "[w]e plan on entering the public markets with an IPO very soon." In phone calls with investors throughout Reliable One's existence, salespeople continually represented that the IPO would take place within six to 18 months, and that stock purchased at a low price (such as the $.50 through $3 per share price that Reliable One typically used during the time period relevant to this Complaint) before the IPO would be worth $30 to $50 per share after the IPO. For example, in February 2020, a Reliable One salesperson assured a prospective investor that Reliable One's shares (then being sold at $1.50 a share) would go public within 18 months and would be worth $50 after the IPO.

27. In reality, as Reliable One, Cravey, and Wiedrich knew, Reliable One had *de minimis* sales revenue, and Reliable One, Cravey, and Wiedrich had taken no steps toward pursuing an IPO, such as retaining an underwriter or preparing a registration statement. Indeed, Reliable One kept promising investors that it would go public, but Wiedrich and Cravey knew that they (as Reliable One's Chairman, CEO, President, and CFO, collectively) would not pursue an IPO unless Reliable One generated sufficient revenue, which it never did. Notwithstanding their knowledge of the matters identified in this paragraph, and in spite of the alluring promises of an imminent IPO, Wiedrich, Cravey, and Reliable One failed to disclose these things to investors.

28. Further, this misrepresentation and/or omission relating to an imminent IPO is especially material when considering other undisclosed facts. For example, between April 2020 and March 2021, Reliable One emailed to potential investors links to a Quantum Filtration PowerPoint presentation. Within the PowerPoint presentation, Reliable One projected $611 million in total revenue for the months of April 2020 through March 2021. It predicted monthly "Total Net Cash Profit" of $3.9 million for May 2020, increasing to $42.1 million by November

2020 and leveling off at $42.2 million per month from December 2020 through March 2021. Reliable One purportedly premised the projections on the ability to operate 10 mask-making machines at full capacity. However, when Reliable One began disseminating the projections in April 2020—when it was projecting almost $4 million in revenue for the very next month—the company had only *purchased* two membrane-making machines. Moreover, while it appears Reliable One had purchased a mask-making machine in April 2020, it was not received until June 2020. By the end of December 2020, Reliable One had purchased several additional machines, but *none* of the machines ever produced masks for commercial sale. In fact, Reliable One never earned a profit and certainly never came close to earning the monthly profits that were projected in the PowerPoint presentation. Yet Reliable One kept providing investors with the same baseless projections through at least March 2021.

29. Reliable One also failed to disclose its poor financial condition to investors. For example, while promising an imminent IPO, Reliable One failed to disclose to investors that it was unable to pay its financial obligations as they came due. From February 2019 to December 2021, Reliable One borrowed over $1.7 million from nine lenders at interest rates ranging from 25% to 50%. Under the loan arrangements, Reliable One was required to make daily payments to the lenders directly from its bank account. On several occasions, Reliable One failed to pay on the loans as required and, instead, switched banks to skirt the lenders' efforts to collect. Eventually, several lenders obtained judgments against Reliable One for unpaid debts of approximately $1.1 million. Further, Reliable One also failed to disclose to investors that, on several occasions, it had insufficient cash on hand to make payroll.

    **(iii) Falsely Claiming that Quantum Filtration's Masks were N95 Certified and FDA Approval was Imminent**

30. In an April 2021 update emailed to investors, Reliable One represented that proprietary facemasks were now for sale on the website of its subsidiary, Quantum Filtration. The email included a link to Quantum Filtration's website. One of the facemasks for sale on the website was designated as "N95." However, this claim was materially false, as each Defendant knew or was severely reckless in not knowing. Cravey and Wiedrich (and therefore Reliable One and Quantum Filtration), knew as early as August 2020 that, before selling a mask with an N95 designation, a company must obtain a NIOSH certification. And each Defendant knew or was severely reckless in not knowing that the Quantum Filtration mask did not have a NIOSH certification. In fact, each Defendant knew by at least February 2021 that Reliable One had submitted mask membranes for testing and that they had "failed miserably." Each Defendant also knew that a second test was also unsuccessful. Despite knowing of these failures, the Defendants continued to tell investors, by sending them e-mails that linked to Quantum Filtration's website, that they were selling N95 masks.

31. In an August 2021 update emailed to investors, Reliable One stated, "[w]e are currently awaiting our 501k [sic][4] approval from the FDA which will allow us to make our proven claims on the effectiveness of blocking and killing any viruses such as Covid and Delta . . . [w]e expect to have that approval shortly which will allow us to advertise our proven claims." As each Defendant knew, or was severely reckless in not knowing, a company seeking to market a device requiring FDA approval—such as a surgical facemask—must submit a 510(k) application, known as a premarket submission, to the FDA to prove that the product is safe and effective for human use. In reality, as each Defendant knew or was severely reckless in not knowing, neither Reliable One nor Quantum Filtration ever submitted a 510(k) application to the

---

[4] The proper statutory reference is "510(k)," not 501(k).

FDA. Accordingly, it was materially false for the Defendants to claim that FDA approval was expected shortly.

### (iv) Lying about Sales Commissions and Officer-and-Director Compensation

32. In a Form D filed with the Commission, Reliable One represented that it used no investor funds to (a) pay commissions to salespeople who offer and sell Reliable One's stock or (b) compensate the company's directors or executive officers. These statements were false. In fact, as Cravey and Wiedrich knew by way of their authority over Reliable One's bank accounts (or were severely reckless in not knowing), Reliable One paid commissions—sourced from investor funds—to salespersons ranging from 12% to 30%. Further, Reliable One used investor funds to compensate Reliable One's officers and directors, including Cravey and Wiedrich. These undisclosed payments to officers and directors totaled at least $2.1 million, including at least approximately $545,000 directly to Cravey.

33. Similarly, the Reliable One PPM represented to investors:

> Reliable One **may** enter into agreements with securities broker-dealers **who are members of the Financial Regulation Industry Authority, Inc.** (FINRA), whereby these broker-dealers will be involved in the sale of the Shares and will be paid a commission by the Reliable One Resources, Inc. **of up to ten percent (10%)** of the offering price of the Shares sold by them, plus an additional unaccountable expense of three percent (3%) of the offering price of the Shares sold by them. As of the date of this Amended Offering Memorandum, Reliable One had not entered into any agreements with any broker-dealer. (Emphasis added.)

34. This statement was misleading because, much like the Form D's false claim concerning the payment of sales commissions, it failed to disclose that the payment of commissions had actually occurred and was not a hypothetical possibility. Moreover, as the Defendants each knew or were severely reckless in not knowing, the salespeople who received the commissions were not representatives of FINRA-member broker-dealers.

### (v) Touting Phony Business Deals

35. In an October 2020 update emailed to investors, Wiedrich stated:

> Some investors have asked why we have started to participate in the hand sanitizer arena. The answer is simple. We currently have a standing order from Saudi Arabia for ten million masks and have been asked if we could provide an alcohol-free hand sanitizer that they can purchase. Since then, we have another Saudi Arabian group that wants to purchase 5 million masks per month and 5 million gallons of sanitizer per month.

In reality, as Wiedrich knew, Reliable One had no such order from anyone in Saudi Arabia, and there is no evidence that Reliable One sold masks or sanitizer to anyone in Saudi Arabia.

36. In an August 2021 update emailed to investors, Reliable One claimed that it was working with the parent company of the Six Flags amusement parks to disinfect the parks' pool waters. The updated asserted that if Reliable One's products could disinfect the Six Flags pool waters, then Reliable One could begin selling its products to Six Flags. Reliable One further claimed that Six Flags had agreed to send samples of its pool waters to be tested by Reliable One. But, as Wiedrich knew—and has admitted under oath—Six Flags never agreed to provide samples of its pool waters to Reliable One or to purchase Reliable One's product(s).

### D. Reliable, Cravey, and Wiedrich Misused Investor Funds.

37. Cravey and Wiedrich, who jointly controlled the bank accounts of Reliable One and Quantum Filtration, spent a significant amount of investor funds in ways that appear inconsistent with representations made to investors in Reliable One's PPM. For example, bank account records show that since January 2019, Reliable One spent approximately $185,000 by making ATM cash withdrawals, shopping online, purchasing groceries and pharmaceuticals, and spending Walmart, liquor stores, plastic-surgery centers, sports venues, and college bookstores. During the same period, Reliable One paid approximately $1.6 million combined to nine of Cravey's family members, including: (a) $307,000 to Cravey's wife who purportedly worked

part-time for Reliable One; and (b) $41,000 to a Cravey family member that Wiedrich, Reliable One's President, claimed not to know.

### E. Reliable Continues to Seek to Raise Investor Funds

38. Reliable One is still seeking to raise money from investors. Both the Reliable One and Quantum Filtration websites currently contain invitations to investors to inquire about investing. Videos of Reliable One's investor pitches are still available on YouTube. And at least as recently as August 2022, Wiedrich solicited investors to purchase Reliable One shares,[5] again before the company's purported IPO, stating in an investor update:

> At this juncture we are working tirelessly towards revenue generation to a level where the company is cash flow positive. Any one of our various projects could achieve this goal *over* the next few months. Reliable One Resources' focus is to then pivot to commence an Initial Public Offering, which we would be targeting for 2023. Currently, investors that wish to benefit from Reliable One Resources' technologies are purchasing the private share's using our standard Subscription Agreement.

39. Meanwhile, Reliable One's website continues to omit Cravey's name and involvement in Reliable One's management and operations. Under the heading "Our Team," the website lists Wiedrich and two vice-presidents, but it does not list or otherwise identify Cravey.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 5(a) and 5(c) of the Securities Act

40. The Commission repeats and re-alleges Paragraphs 1 through 39 of the Complaint as if fully set forth herein.

---

[5] Based on Wiedrich's sworn testimony in October 2022, Reliable One: (a) is currently raising money by selling joint venture interests in a helium well project, and has raised approximately $1.5 million to date; and (b) intends to begin raising funds for another joint venture relating to an unspecified land development.

41. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly:

   a. made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or

   b. for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

   c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

42. There were no applicable exemptions from registration.

43. By reason of the foregoing, each Defendant has violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, [15 U.S.C. § 77e(a) and (c)].

## SECOND CLAIM
### Violations of Section 17(a) of the Securities Act

44. The Commission repeats and re-alleges Paragraphs 1 through 39 of the Complaint as if fully set forth herein.

45. By engaging in the conduct described herein, each Defendant directly or indirectly, singly or in concert, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:

   a. employed a device, scheme, or artifice to defraud;

   b. obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

46. With regard to violations of Section 17(a)(1) of the Securities Act, each Defendant acted intentionally, knowingly, or with severe recklessness. With regard to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, each Defendant acted intentionally, knowingly, recklessly, or negligently.

47. By engaging in this conduct, each Defendant has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## THIRD CLAIM
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

48. The Commission repeats and re-alleges Paragraphs 1 through 39 of the Complaint as if fully set forth herein.

49. By engaging in the conduct described herein, each Defendant directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

   a. employed a device, scheme, or artifice to defraud;

b.  made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

c.  engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

50.     By engaging in this conduct, each Defendant has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## VI.
## RELIEF REQUESTED

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a)     Temporarily, preliminarily, and permanently enjoining Defendants from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(b)     Temporarily, preliminarily, and permanently enjoining Defendants Cravey and Wiedrich from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided however, that such injunction shall not prevent Defendants Cravey and Wiedrich from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

(c)     Temporarily, preliminarily, and permanently barring Defendants Cravey and Wiedrich from participating in any offering of a penny stock, including: acting as a promoter,

finder, consultant, agent or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance of trading of any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock.

(d) Temporarily, preliminarily, and permanently enjoining Defendants Cravey and Wiedrich from serving as an officer or director of any issuer required to file reports with the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act [15 U.S.C. §§ 78l(b), 78l(g), and 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

(e) Ordering each Defendant to disgorge all ill-gotten gains realized by each of them as a result of the violations alleged herein, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)], plus prejudgment interest thereon;

(f) Ordering each Defendant to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(g) Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(h) Granting all other relief to which the Commission may be entitled.

Dated: January 6, 2013

Respectfully submitted,

DAVID B. REECE
Texas Bar No. 24002810
Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, 19th Floor
Fort Worth, TX 76102
Telephone: (817) 978-6476
Facsimile: (817) 978-4927
reeced@sec.gov

ATTORNEY FOR PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION